**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

JOHN R. GEIL,

                Plaintiff,

                                         **DECISION & ORDER**

    v.                                          14-CV-6463

CAROLYN W. COLVIN,

                Defendant.

---

## Preliminary Statement

Plaintiff John Geil brings this action pursuant to Titles II and XVI of the Social Security Act seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his applications for disability insurance benefits and supplemental security income. See Complaint (Docket # 1). Presently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. See Docket ## 10, 11, 12.

## Background and Procedural History

On December 21, 2010, plaintiff applied for supplemental security income. Administrative Record ("AR.") at 185-91. The claim was denied on April 28, 2011. AR. at 65-68. Plaintiff timely filed a request for a hearing before an Administrative

Law Judge ("ALJ").   AR. at 71-73.   The hearing was held on November 7, 2012 before ALJ Lawrence Levey.   AR. at 16-45. Plaintiff appeared at the hearing with his attorney, Justin Goldstein.   Id.   Peter Manzi, a Vocational Expert, testified at the hearing.   Id.   On November 23, 2012, the ALJ issued an unfavorable decision, determining that claimant was not disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act.   AR. at 48—64.   Plaintiff requested review of the ALJ's decision with the Appeals Council.   AR. at 14-15.   On June 17, 2014, the Appeals Council denied plaintiff's request for review, thereby adopting the ALJ's decision as the Commissioner's decision.   AR. at 1—5.   Plaintiff has exhausted his administrative remedies, and this federal lawsuit followed.

## Medical History

Plaintiff was born on July 2, 1990 and was twenty-two years old at the hearing.   AR. at 199.   He graduated with an Independent Education Plan ("IEP") diploma in June 2008.   AR. at 204, 635.   He reported no past work as an adult.   AR. at 203.

On May 18, 2006, school psychologist Jennifer Romesser conducted a psychological assessment of plaintiff.   AR. at 238-41, 622-25.   Because of his placement in a special education learning program, plaintiff underwent an evaluation every three

2

years.  AR. at 622.  Dr. Romesser reported that plaintiff was enrolled in a 12:1:1 self-contained special education class due to a learning disability.  Id.  Dr. Romesser's report contains numerous test results: in May 1995 on the Differential Ability Scales (DAS) examination, plaintiff obtained a verbal scale score of 81 (Low Average), a nonverbal scale score of 74 (Low), and a general cognitive abilities score of 76 (Low).  AR. at 623.  On the Wechsler Intelligence Scale for Children—Third Edition (WISC-III) administered in July 1997, plaintiff obtained a verbal scale score of 79 (Borderline), a performance scale score of 69 (Extremely Low), and a full scale score of 71 (Borderline).  AR. at 623.  On a DAS examination administered in June 2000, plaintiff had a verbal scale score of 122 (Very High), a nonverbal scale score of 77 (Low), and a general cognitive abilities score of 91 (Average).  AR. at 624.  On the Wechsler Abbreviated Scale of Intelligence (WASI), administered in August 2003, plaintiff obtained a verbal scale score of 83 (Low Average), a performance scale score of 65 (Extremely Low), and a full scale score of 72 (Borderline).  Id.  On the Woodcock-Johnson III Tests of Cognitive Abilities—Brief (W-J III BIA), administered on the day of the report, plaintiff obtained an intellectual ability score of 76 (Low), and a verbal ability of 82 (Low Average).  On the Learning Disability Evaluation

3

Scale-School Version (LDES), administered the day before Dr. Romesser's report, the plaintiff obtained a learning quotient score of 79. Id. Dr. Romesser concluded that a score of 79 on the LDES suggested that plaintiff "continue[d] to exhibit characteristics of a learning disability. . . he appear[ed] to lack skill development in the areas of listening, thinking, reading, writing, spelling, and mathematical computation." AR. at 625.

Plaintiff's social worker from Wheatland-Chili Central School District, Mitch Kilgor, completed a teacher questionnaire on April 7, 2011. AR. at 228-35. Mr. Kilgore based his answers on his daily interactions with the plaintiff over more than four years. AR. at 228. Mr. Kilgore noted that plaintiff had problems, ranging from slight to serious, in every indicator of his ability to "acquire and use information." AR. at 229. Mr. Kilgore noted serious problems in reading and comprehending written material, and expressing ideas in written form, indicating that plaintiff "required support[] from special education staff on a daily basis." Id. Mr Kilgore indicated that plaintiff had problems, ranging from slight to serious, in every aspect of "attending and completing tasks" on a daily basis. Mr. Kilgor indicated a serious problem plaintiff's ability to carry out multi-step instructions, organize his own

4

things, complete assignments, and work at a reasonable pace.
Plaintiff had "obvious problems" in a number of areas, including
paying attention when spoken to, focusing long enough to finish
a task, refocusing, and taking turns. AR. at 230. Mr. Kilgore
indicated that plaintiff had daily problems in all areas of
interacting and relating with others, including "serious
problems" appropriately expressing anger and seeking attention.
AR. at 231. Mr. Kilgore stated that plaintiff "required support
from his teachers, social workers and behavioral specialists on
a daily basis to handle frustration, [and to] increase social
and coping skills." AR. at 233.

Beginning in March 2010, and continuing through the time of
his hearing before the ALJ, plaintiff underwent monthly
psychosocial treatment at Genesee Mental Health Center. AR. at
441-619. LCSW Amy Meier performed plaintiff's psychosocial
assessment on March 8, 2010, and diagnosed him with alcohol
dependence in sustained full remission; anxiety disorder NOS;
and ADHD, predominately inattentive type. AR. at 444. She gave
him a Global Assessment of Functioning (GAF) score of 58,[1] and

---

[1] The GAF scale rates overall psychological functioning on a scale of 0-100
and takes into account psychological, social, and occupational functioning.
See, Zabala v. Astrue, 595 F.3d 402, 405 n.1 (2d Cir. 2010). A GAF score in
the range of 51 to 60 indicates "[s]erious symptoms (e.g., suicidal ideation,
severe obsessional rituals, frequent shoplifting) OR any serious impairment
in social, occupational or school functioning (e.g., no friends, unable to
keep a job)." Id. at n.3 (quoting Diagnostic and Statistical Manual of
Mental Disorders ("DSM-IV"), at 34 (4th ed. Rev.2000)).

5

recommended ongoing treatment. Id.

On March 18, 2010, plaintiff underwent a psychosocial assessment by LCSW Laura Masceri. AR. at 448-51. Ms. Masceri noted about plaintiff in his Mental Status Report: "increased motor activity, being restless in his chair and tapping a pen on the desk. His speech is spontaneous and clear. Thoughts are goal oriented and organized although he does report some negative rumination and racing thoughts. His mood is anxious, his affect is congruent with mood." AR. at 449. Ms. Masceri reported that plaintiff had twenty-four hour support and was living with his grandmother at the time. AR. at 450. She opined that plaintiff struggled with life skills in general and had a difficult time managing changes in his life. She felt that transitions in his life were exacerbating his anxiety, making it difficult for him to make decisions and stay focused. Id. Ms. Masceri diagnosed plaintiff with anxiety disorder and ADHD, predominately inattentive type; she gave him a GAF of 58. Id.

Ms. Masceri logged outpatient progress notes from her meetings with plaintiff on March 26, April 2, April 9, and April 21, 2010. AR. at 454-63. In these meetings she described plaintiff as "cooperative" and "goal-oriented." AR. at 454, 456, 458, 462. She also noted that plaintiff had tangential or

6

agitated racing thought processes. AR. at 452, 458, 462.

On April 28, 2010, plaintiff underwent a psychiatric evaluation by psychiatric mental health adult nurse practitioner Joanna Streb at Genesee Mental Health Center. AR. at 464-65, 498. Plaintiff reported to NP Streb that he struggled with anxiety when assigned big tasks and with schedule changes, and tended to "blow up" and yell at people. AR. at 464. She noted that plaintiff was well groomed, cooperative, concentrated, and had organized thought processes and congruent affect, but that he had spontaneous speech, negative ruminations, and an anxious mood. AR. at 465. NP Streb prescribed plaintiff Neurontin. AR. at 498.

Plaintiff continued to see LCSW Masceri weekly through the time of his 2012 hearing with the ALJ and after. In her numerous pages of notes on these meetings, Ms. Masceri frequently described plaintiff as one or more of the following: anxious, agitated, obsessive, impulsive, depressed, explosive, lacking focus, negative ruminations, tangential thought processes, restless motor activity, and regressed behavior. AR. at 474-707. At the same time, she frequently noted that plaintiff had fair insight, a well-groomed appearance, and a generally cooperative attitude. Id.

Plaintiff also continued to see NP Streb for medication

7

review.   He complained to her about increased anxiety, racing thoughts, and anger.   AR. at 494-95, 508, 559, 574.   NP Streb prescribed plaintiff Zoloft to supplement Neurontin on June 3, 2010.   AR. at 475.   Responding to plaintiff's complaints about lethargy, NP Streb prescribed Celexa on August 18, 2010.   AR. at 494.   She discontinued Celexa and prescribed Wellbutrin on October 6, 2010.   AR. at 508-09.   NP Streb increased his Prozac dosage on April 26, 2011, AR. at 574, although plaintiff reported that he had not been taking his Prozac on March 20, 2012.   AR. at 686.

On February 15, 2010, Dr. Christine Ransom completed a psychological and intellectual assessment of plaintiff for determination of disability for the Monroe County Department of Social Services.   AR. at 637-43.   Plaintiff reported that he was homeless and living in his vehicle.   AR. at 638.   Plaintiff also reported fluctuating appetite, easily becoming irritable, difficulty concentrating as he could not stay focused on one thing, inability to sit still, and excessive energy.   Id. Plaintiff remarked that he got along adequately with friends and family, was trying to organize his life, and was sleeping adequately.   Id.

On a Mental Status Examination, Dr. Ransom noted that plaintiff's general appearance, speech and language, thought

8

process, orientation, insight and judgment were all normal. His mood and affect were both abnormal, "moderately labile," and his attention and concentration, recent and remote memory, and cognitive functioning were "moderately" or "mildly" impaired. AR. at 639-40.

Dr. Ransom performed a Wechsler Adult Intelligence Scale (WAIS) IV assessment, and plaintiff scored a verbal/comprehension IQ of 81, a perceptual/reasoning IQ of 71, a working/memory IQ of 74, a processing speed IQ of 65, and a full scale IQ of 69. AR. at 640. Dr. Ransom reported that plaintiff had a third grade reading level and overall intellectual capacity and processing speed in the mildly mentally retarded range. AR. at 641. Dr. Ransom assessed a GAF score of 63.[2] Id. In making an employment determination, Dr. Ransom noted that plaintiff was "very limited," meaning "unable to function 75% or more of the time" in ability to perform complex tasks independently, maintaining attention and concentration for rote tasks, capability of regularly attending to routine and maintaining a schedule, and capability of low stress and simple tasks. He was additionally "moderately

---

[2] A GAF in the range of 61-70 indicates "[s]ome mild sypmtoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Zabala v. Astrue, 595 F.3d 402, 405 n.1 (2d Cir. 2010) (citing DSM-IV at 34).

9

limited," indicating an inability to function 50% of the time,
with regards to following, understanding, and remembering simple
instructions and directions; capability of maintaining basic
standards of hygiene and grooming; and ability to use public
transportation.   Id.   Notably, Dr. Ransom did not indicate a
single function that the plaintiff would be able to perform
without some limitation.   Dr. Ransom felt that plaintiff would
be unable to participate in any activities except treatment or
rehabilitation for six months, though she did not find plaintiff
to be permanently disabled.   AR. at 642.

Plaintiff's treating social worker Laura Mascéri completed
four psychological assessments for the determination of
employability for the Monroe County Department of Human Services
dated April 21, 2010; July 9, 2010; August 17, 2010; and
February 9, 2011.   AR. at 644-58.   She reported consistently
that due to generalized anxiety, ADHD, and cognitive
limitations, plaintiff was unable to participate in any
activities beyond treatment.   AR. at 649, 653, 657.   She found
the plaintiff was "very limited," indicating unable to perform
25% of the time or more, in maintaining attention and
concentration for rote tasks.   Id.   Plaintiff was moderately
limited (10-25% of the time) in following, understanding, and
remembering simple instructions and directions; and regularly

10

attending to a routine and maintaining a schedule. AR. at 649, 653.

Plaintiff once again saw Dr. Christine Ransom on March 14, 2011 for a psychiatric evaluation for the Social Security Administration. AR. at 402-05. Dr. Ransom indicated that plaintiff was no longer homeless and was residing alone. AR. at 402. He had been driven to the assessment by his aunt. Id. Dr. Ransom noted that plaintiff's appearance was appropriate, though his behavior was hyperactive and restless, and his eye contact was darting and unfocused. His speech was intelligible and fluent though moderately pressured, moderately dysphoric, and moderately labile. His thought processes evidenced no hallucinations, delusions or paranoia. His affect was moderately dysphoric, moderately irritable, and moderately labile during the evaluation. AR. at 403. Dr. Ransom noted problems with plaintiff's attention and concentration and his immediate memory. Remote memory was intact. AR. at 403-04. His cognitive function appeared to be in the borderline range, and his general fund of information was "somewhat limited." Id. Dr. Ransom opined that the plaintiff

> can dress, bathe and groom himself, cook and
> prepare food, do cleaning, laundry and
> shopping. He is not able to manage money
> due to limited intellectual capacity . . . .
> He is socializing with family and friends.

11

> He enjoys walking the dog, watching TV and
> going to the movies.   He finds, however,
> that he starts projects and does not finish.
> He easily becomes agitated around people.

AR. at 404.   Dr. Ransom concluded her statements, finding that

plaintiff could follow and understand simple directions, perform

simple tasks, and maintain attention for simple tasks.   She

opined that he would have moderate difficulty with complex tasks

and dealing with stress.   She concluded by diagnosing plaintiff

with bipolar disorder, currently moderate, probable borderline

intellectual capacity, high blood pressure, heart problems and

alcohol and marijuana dependence in remission.   Id.

On March 14, 2011, plaintiff underwent a consultative

internal medicine examination by Dr. Harbinder Toor at the

request of the Social Security Administration.   AR. at 392-95.

Plaintiff had injured his right collar bone in November 2010,

and an x-ray after the incident showed a displaced fracture of

the right clavicle.   AR. at 315.   Client complained to Dr. Toor

of on-and-off pain in his collar bone, and occasional tingling

and numbness.   AR. at 392.   Plaintiff also stated that he had

difficulty pushing, pulling, reaching, and lifting his right arm

due to the injury.   Id.       Dr. Toor noted that plaintiff's

activities of daily life included: "Cooking daily.   Cleaning and

laundry once a week.   Shopping once a month.   No child care.

12

Showers daily. No baths. Dresses daily. He watches TV and listens to the radio. No reading. He goes out. No sports. No socialization. No hobby." AR. at 393. Dr. Toor diagnosed plaintiff with a history of collar bone injury on the right side recently; history of mental health issues including depression, anxiety, attention deficit disorder, and attention deficit hyperactivity disorder; history of hypertension; and a history of learning difficulty. AR. at 394-95. Dr. Toor opined that plaintiff had mild to moderate limitation with pushing, pulling, and heavy lifting because of the injury to his right collarbone. AR. at 395.

On April 27, 2011, state agency review psychologist L. Blackwell reviewed plaintiff's medical records. AR. 406-19. In Dr. Blackwell's opinion, plaintiff had a moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of deterioration. AR. at 416. Dr. Blackwell concluded that plaintiff could perform unskilled entry-level work in a setting with limited social contact. AR. at 423.

## Hearing Testimony

Testimony of Plaintiff: On November 7, 2012, a hearing was

13

held before ALJ Larry Levey.   Plaintiff testified that he had attended special education classes with between ten to fifteen students.   AR. at 23.   Plaintiff stated that he had received accommodations during tests, including being placed in a different room by himself, having no time limits, and having the questions read to him.   AR. at 24.   Plaintiff testified that he had worked in culinary arts through BOCES for a year and a half, but had not worked since because he has been unable to find employment.   AR. at 24-25.

When asked how he spends a typical day, plaintiff responded that he cleans and watches TV, though he has difficulty cleaning because of his attention and anxiety.   AR. at 25.   He stated that he sees his friends and family twice a week, and that he likes to fish and spend time outdoors.   Id.   He stated that he goes camping, does not socialize, but does go on dates to restaurants or movies.   AR. at 30-31.   Plaintiff stated that he is able to go grocery shopping, but that he is very bad with managing money and so his grandmother or mother help him with his finances.   AR. at 27.   When asked if he was able to read and understand bills that received in the mail, plaintiff responded that he can not a lot of the time, and that his grandmother goes over his bills with him.   AR. at 28.   The ALJ asked plaintiff if he can count change, and plaintiff responded that he can, but he

gets confused with higher bills.  AR. at 28-29.  Plaintiff testified that he can drive and has his driver's license, but that he had the questions read to him on the written portion of his driving exam.  AR. at 28-29.  He also stated that he gets lost driving to new places.  AR. at 29.

Plaintiff testified that he has been working weekly with social worker Laura Masceri on his anxiety, depression, "blow ups," and anger.  AR. at 26.  He stated that the anger is caused by not being able to deal with his anxiety and not being able to focus.  AR. at 26-27.  He stated that he is able to be around a lot of people, but gets claustrophobic in small areas.  AR. at 27.

Plaintiff's grandmother, Joyce Geil, wrote a letter in support of her grandson's application for SSI.  AR. at 285.  She wrote that she shops for plaintiff's food and clothes, does his laundry, and manages his doctor's appointments.  Id.

Testimony of the Vocational Expert:  Dr. Peter Manzi, a vocational expert ("VE"), also testified at the hearing.  AR. at 33-44.  The ALJ asked the VE to consider the following hypothetical: an individual who (1) possesses the same age, educational background, and past work experience as the plaintiff; (2) can perform work at the light exertional level; (3) can occasionally utilize his non-dominant right upper

15

extremity for pushing, pulling, and overhead reaching; (4) must avoid exposure to temperature extremes, excessive wetness, and excessive humidity; (5) can read and write at an elementary school level; and (6) can perform simple, routine, and repetitive tasks in a work environment free of fast paced production that involves only simple work-related decisions, few if any changes in the workplace, and no more than occasional interpersonal interaction with members of the public, coworkers, and supervisors. AR. at 34—37. The VE responded that such an individual could perform work as a photocopy (U.S. Dictionary of Occupational Titles (DOT) Code 207.685-014), of which there are 33,865 jobs nationally and 143 jobs regionally, and as a collator operator (DOT Code 208.685-010), of which there are 44,148 jobs nationally and 205 jobs regionally. AR. at 37.

For the second hypothetical, the ALJ asked the VE to assume the same characteristics but this individual could read and write at the fifth grade level. AR. at 38. The VE responded that such an individual could perform work as a laundry sorter (DOT Code 361.687-014), of which there are 128,478 jobs nationally and 378 jobs regionally, and as an addresser (DOT Code 209.587-010), of which there are 25,042 jobs nationally and 233 regionally. Id.

16

## Determining Disability Under the Social Security Act

The Evaluation Process:   The Social Security Act provides that a claimant will be deemed to be disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  The impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 1382c(a)(3)(B).

The determination of disability entails a five-step sequential evaluation process:

> 1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> 2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.
>
> 3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will

17

automatically consider him disabled, without considering vocations factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000); see also 20 C.F.R. §§ 404.1520, 416.920. Plaintiff bears the burden of proving his case at steps one through four. At step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (noting that Commissioner "need not provide additional evidence of the claimant's residual functional capacity" at step five); see also 20 C.F.R. § 404.1560(c)(2).

When evaluating the severity of mental impairments, the reviewing authority must also apply a "special technique" at the second and third steps of the five-step analysis. Kohler v. Astrue, 546 F. 3d 260, 265 (2d Cir. 2008); see also 20 C.F.R. §

18

404.1520a(a).   First, the ALJ must determine whether plaintiff has a "medically determinable mental impairment."   Kohler, 546 F.3d at 265—66; see also 20 C.F.R. § 404.1520a(b)(1).   If plaintiff has such an impairment, the ALJ must "rate the degree of functional limitation resulting from the impairment(s)" in four broad functional areas: "(1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation."   Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(c)(3).   "[I]f the degree of limitation in each of the first three areas is rated 'mild' or better, and no episodes of decompensation are identified, then the reviewing authority generally will conclude that the claimant's mental impairment is not 'severe' and will deny benefits."   Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(d)(1).   If plaintiff's mental impairment is considered severe, the ALJ "will first compare the relevant medical findings and the functional limitation ratings to the criteria of listed mental disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder."   Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(d)(2).   If plaintiff's mental impairment meets any listed mental disorder, plaintiff "will be found to be disabled."   Kohler, 546 F.3d at 266.   If not, the ALJ will then

make a finding as to plaintiff's residual functional capacity. Id.; see also 20 C.F.R. § 404.1520a(d)(3).

The ALJ's Decision: In applying the five-step sequential evaluation, the ALJ made the following determinations. At the first step, the ALJ found that plaintiff has not engaged in substantial gainful activity since December 1, 2010, the application date. AR. at 53. At the second step, the ALJ found that plaintiff has severe impairments of learning disability, borderline intellectual functioning, ADHD by history, anxiety disorder, substance abuse in reported remission, bipolar disorder, and status-post right collar bone injury. Id. The ALJ noted that "the claimant's above impairments are cumulatively severe because in combination they cause more than minimal limitations on his ability to undertake basic work activities." Id. At the third step, the ALJ analyzed the medical evidence and found that plaintiff does not have a listed impairment which would render him disabled under the social security listings. AR. at 53-55. In making this determination, the ALJ found that plaintiff has moderate restrictions in activities of daily living; moderate difficulties in social functioning; moderate difficulties with regard to concentration, persistence, or pace; and experienced no episodes of decompensation. AR. at 54.

Accordingly, the ALJ moved to the fourth step, which required asking whether plaintiff has the residual functional capacity ("RFC") to perform his past work, notwithstanding his severe impairments. The ALJ concluded that plaintiff has the RFC to perform light work, with the following limitations:

> [Plaintiff] can only occasionally utilize his non-dominant upper extremity for pushing, pulling, and overhead reaching, is precluded from work related exposure to temperature extremes, excessive wetness, and excessive humidity, and requires a position that involves reading and writing at no more than a 5th grade level. In addition, the claimant is limited to performing simple, routine, repetitive tasks, in a work environment free of fast paced production requirements, involving only simple work related decisions, with few, if any, changes in the work place, and no more than occasional interpersonal interaction with members of the public, coworkers, and supervisors.

AR. at 55-56.

Because the plaintiff has no past relevant work, the ALJ moved to the fifth step, which is comprised of two parts. AR. at 59. First, the ALJ assessed plaintiff's job qualifications by considering his physical ability, age, education, and previous work experience. Id. The ALJ next determined whether jobs exist in the national economy that a person having plaintiff's qualifications and RFC could perform. Id.; see also 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 404.1520(f), 416.920(f). The ALJ

21

found that "there are jobs that exist in significant numbers in the national economy" that plaintiff can perform, specifically photocopy machine operator, collator operator, laundry sorter, and addresser, pursuant to the VE's testimony. AR. at 60.

## Standard of Review

The scope of this Court's review of the ALJ's decision denying benefits to plaintiff is limited. It is not the function of the Court to determine *de novo* whether plaintiff is disabled. Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447 (2d Cir. 2012). Rather, so long as a review of the administrative record confirms that "there is substantial evidence supporting the Commissioner's decision," and "the Commissioner applied the correct legal standard," the Commissioner's determination should not be disturbed. Acierno v. Barnhart, 475 F.3d 77, 80–81 (2d Cir. 2007), cert. denied, 551 U.S. 1132. "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Brault, 683 F.3d at 447–48 (internal citation and quotation marks omitted). "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they

22

are supported by substantial evidence." <u>Genier v. Astrue</u>, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks omitted).

This deferential standard of review does not mean, however, that the Court should simply "rubber stamp" the Commissioner's determination. "Even when a claimant is represented by counsel, it is the well-established rule in our circuit that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." <u>Moran v. Astrue</u>, 569 F.3d 108, 112 (2d Cir. 2009); <u>see also</u> <u>Melville v. Apfel</u>, 198 F.3d 45, 51 (2d Cir. 1999) ("Because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record."). While not every factual conflict in the record need be explicitly reconciled by the ALJ, "crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence." <u>Ferraris v. Heckler</u>, 728 F.2d 582, 587 (2d Cir. 1984). "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." <u>Mongeur v. Heckler</u>, 722

23

F.2d 1033, 1038 (2d Cir. 1983).  Moreover, "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."  Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

## Discussion

Plaintiff challenges the ALJ's decision on the grounds that the ALJ failed to properly evaluate evidence supporting that plaintiff met Listing 12.05C, and that the ALJ failed to properly evaluate multiple medical opinions of record.  See Plaintiff's Memorandum of Law (Docket # 10-1), Plaintiff's Response to the Commissioner's Brief (Docket # 12).

Listing 12.05C states in pertinent part:

> 12.05C     Intellectual     Disability: Intellectual   disability   refers   to significantly     subaverage     general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for the disorder is met when the requirements in A,

24

> B, C, or D are satisfied . . . .
>
> . . . C. A valid verbal, performance, or
> full scale IQ of 60 through 70 and a
> physical or other mental impairment imposing
> an additional and significant work-related
> limitation of function[]

20 C.F.R. Part 404, Subpart P, App. 1 § 12.05(C). Thus, to meet

Listing 12.05(C), plaintiff must show (1) below average

intellectual function with adaptive functioning deficits

manifested before age twenty-two and continuing during the claim

period; (2) a valid IQ score of 60 through 70; and (3) an

impairment, other than his low IQ, that imposes "an additional

and significant work-related limitation of functioning." Id.;

Talavera v. Astrue, 697 F.3d 145, 153 (2d Cir. 2012). We

approach these requirements sequentially:

Deficits in Adaptive Functioning: The Listing requirement

for 12.05 requires a below average intellectual function with

adaptive functioning deficits manifested before age twenty-two

and continuing during the claim period. 20 C.F.R. Part 404,

Subpart P, App. 1 § 12.05. Neither party nor the ALJ contest

that whatever intellectual and adaptive functioning deficits

plaintiff has, began before the age of twenty-two. Plaintiff

was twenty-two at the time of his hearing and twenty when he

filed his initial application for supplemental security income.

AR. at 51.

The ALJ, however, found that plaintiff did not have adaptive functioning deficits. In analyzing adaptive functioning the ALJ found that plaintiff:

> is capable of living independently, caring for a pet, and completing normal household chores without assistance. In addition, the claimant was able to obtain a driver's license and testified that he dates, goes to movies and restaurants, gets along with others, and engages in fishing, camping, and riding four wheeler. Furthermore, the claimant's school records characterize his cognitive functioning during the developmental period as being low to low average, include full scale IQ results higher than the range required by this listing, and note that his academic performance was at or above the level of 25% of same age students.

AR. at 55 (internal citations omitted). After carefully reviewing the record, I conclude that substantial evidence does not support the ALJ's finding that plaintiff lacked deficits in adaptive functioning.

A deficit in adaptive functioning "denotes an inability to cope with the challenges of ordinary everyday life." Barton v. Astrue, No. 3:08-CV-0810, 2009 WL 5067526, at *7 (N.D.N.Y. Dec. 16, 2009) (quoting Novy v. Astrue, 497 F.3d 708, 710 (7th Cir. 2007) (citing Diagnostic and Statistical Manual of Mental Disorders-IV 42 (4th ed. 2000))). "The term 'adaptive functioning' refers to the individual's progress in acquiring

26

mental, academic, social and personal skills as compared with other unimpaired individuals of his/her same age." POMS DI 24515.056D2; Lyons v. Colvin, No. 7:13-CV-00614, 2014 WL 4826789, at *10 (N.D.N.Y. Sept. 29, 2014). The American Psychiatric Association's criteria for mental retardation require deficits or impairments in adaptive functioning in two out of eleven areas. DSM-IV 49 (4th ed. 2000) (listing areas of adaptive functioning as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety). Although the Commissioner has not adopted the DSM-IV criteria, it is clear that plaintiff need not have complete lack of adaptive functioning to qualify as "deficient." Barton v. Astrue, No. 3:08-CV-0810, 2009 WL 5067526, at *8 (N.D.N.Y. Dec. 16, 2009); Ali v. Astrue, No. 09-CV-2123, 2010 WL 889550, at *5 (N.D.N.Y. March 8, 2010).

The Commissioner argues that testimony that plaintiff dates, socializes with friends and family, lives alone, has a driver's license, attends therapy regularly, fishes and camps, and obtained a high school diploma indicates that he does not have deficits in adaptive functioning. See Defendant's Brief in Support (Docket # 11-1) at 22-23. While plaintiff clearly has some functional abilities, an ALJ must evaluate the more

"expansive activities that comprise adaptive functioning" beyond just activities of daily living.  Lyons v. Colvin, No. 7:13-CV-00614, 2014 WL 4826789, at *10 (N.D.N.Y. Sept. 29, 2014) (noting that plaintiff's inability to function academically or vocationally outside of a highly structured setting, to manage shopping, cooking, or personal finances independently is indicative of Listing-level deficits in adaptive functioning). The ALJ's decision must provide a whole picture of the plaintiff's life functions, not just certain capabilities.  See Carrube v. Astrue, No. 3:08-CV-0830, 2009 WL 6527504, at *4-5 (N.D.N.Y. Dec. 2, 2009) (remanding the decision because the ALJ failed to assess any evidence indicating plaintiff's inability to cope with everyday life).

Here, evidence throughout the record indicates that the ALJ failed to properly evaluate plaintiff's adaptive functioning. Plaintiff was in special education classes and graduated with an IEP diploma.  AR. at 204.  He was in a 12:1:1 classroom with weekly counseling and speech therapy.  AR. at 629.  Plaintiff required support from his teachers and social workers on a daily basis.  AR. at 229.  Plaintiff has been tested numerous times on his abilities to complete tasks and carry out multi-step instructions, with the consistent finding that he has "serious problems" in these areas.  AR. at 229.  See also, AR. at 404;

28

641.

Plaintiff has serious problems expressing anger, and is emotionally reactive. AR. at 27, 233, 488, 501. Plaintiff described himself as having "blow ups," and testified that he has been unsuccessful at finding work because of his attitude. AR. at 27, 31. His school reports indicate that he required daily work with teachers, social workers, and behavioral specialists to handle frustration and coping skills. AR. at 233. He responds poorly to unplanned events. AR. at 601.

Most importantly, perhaps, is the substantial evidence in the record showing that, despite the Commissioner's characterization, plaintiff does not and cannot live independently. Although plaintiff now lives in his own apartment, his apartment is down the street from his grandmother's house and she provides him daily assistance with activities of daily living, including help buying groceries and managing his food stamps, money, and doctor's appointments. AR. at 285, 422. The record indicates that there were periods when the plaintiff was homeless. AR. at 638. Despite the ALJ and the Commissioner's assertions otherwise, the record shows the plaintiff to be substantially limited in his ability to perform daily living activities.

The record reveals that the ALJ also did not adequately

29

consider or evaluate evidence of plaintiff's deficits in academic and vocational functioning. The record is replete with evidence of plaintiff's need for special education classes and such evidence is particularly relevant to adaptive functioning deficits. See DeCarlo v. Astrue, No. 8:06-CV-488, 2009 WL 1707482, at *6 (N.D.N.Y. June 17, 2009) (finding that evidence a claimant attended special education classes, dropped out of school before graduation, or had difficulties in reading, writing, or math can be circumstantial evidence of deficits in adaptive functioning); MacMillan v. Astrue, No. 1:07-CV-0959, 2009 WL 4807311 (N.D.N.Y. Dec. 7, 2009) (noting that attendance in special education classes and graduating with an IEP suggest deficits in adaptive function); Lyons v. Colvin, No. 7:13-CV-00614, 2014 WL 4826789, at *10 (N.D.N.Y. Sept. 29, 2014) (holding that plaintiff's inability to function academically or vocationally outside of a highly structured setting, to manage shopping, cooking, or personal finances independently is evidence indicative of Listing-level deficits in adaptive functioning).

The ALJ has erred by relying solely on those medical records which emphasize the plaintiff's health, while ignoring equally relevant medical evidence that emphasizes the plaintiff's instability. Lugo v. Chater, 932 F.Supp. 497, 503

30

(S.D.N.Y. 1996); See Barton v. Astrue, No. 3:08-CV-0810, 2009 WL 5067526, at *7 (N.D.N.Y. Dec. 16, 2009) ("[T]he ALJ's failure to address the substantial evidence of record indicating that [p]laintiff had deficits in adaptive functioning suggests that the ALJ treated adequate functioning in one or two areas as excluding evidence of clear deficits in other areas."); See also Miller v. Colvin, No. 6:14-CV-06331, 2015 WL 4892618, at *5 (W.D.N.Y. Aug. 17, 2015) ("Plaintiff's performance of basic adaptive activities in his own home, or at a store where he has very limited interaction with other people, is not probative of his abilities to, e.g., follow work rules, relate to co-workers, use judgment, deal with work stresses, maintain attention and concentration, and interact appropriately with supervisors . . . ."). For example, in making his Listing determination, the ALJ never referenced the teacher questionnaire of school social worker Mitch Kilgore.  Mr. Kilgor had daily interactions with the plaintiff for four years at Wheatland-Chili Central School District, and his report contains specific, descriptive opinions of the plaintiff's abilities.  AR. at 228-35.  Mr. Kilgore noted repeatedly that plaintiff needed daily intervention from his teachers, social workers and behavioral specialists, and that he did not have appropriate coping mechanisms to handle his frustration and anger.  AR. at 231, 233.  References to

plaintiff's inability to manage his emotions is consistent throughout the entire record, including in LCSW Masceri's weekly reports over the course of two years meeting with plaintiff, Dr. Ransom's assessment of plaintiff, AR. at 638, NP Joanna Streb's psychiatric evaluation of plaintiff, AR. at 464, and the plaintiff's own testimony. The ALJ's decision does not adequately discuss or address evidence of plaintiff's emotional instability, anger management deficits, or behavioral problems despite repeated references in the medical and educational records.

Plaintiff's IQ Scores: The second requirement under a 12.05(c) analysis is the IQ score. There is no question that plaintiff's IQ score meets the Listing 12.05C requirement. Plaintiff took IQ tests in 1997, 2003 and 2010, and had multiple scores in the 60-70 range. AR. at 624. The reported scores include a performance IQ of 65 and a full scale IQ of 69 in 2010, and performance IQ scores of 69 and 65 in 1997 and 2003, respectively. AR. at 640, 239-40. It is both the policy of the Commissioner and the holding of courts within this circuit to apply the lowest score received by the plaintiff in a 12.05C determination. "In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler

series, [the Commissioner] use[s] the lowest of these in conjunction with 12.05." 20 C.F.R. § 404, Subpart P, App. 1 § 12.00D(6)(c); Decarlo v. Astrue, No. 8:06-CV-488, 2009 WL 1707482, at *4 (N.D.N.Y. June 17, 2009) (applying plaintiff's lowest IQ score of 68 to find a 12.05C Listing).

Despite plaintiff's contention that the ALJ cherry-picked IQ scores to deny a Listing, the decision shows that the ALJ appropriately noted that plaintiff "did have a tested performance IQ between 60 and 70 prior to age 22, but he does not display the deficits in adaptive functioning required by the listing." AR. at 55. As the Court reads the ALJ's decision, the ALJ accepted the requisite IQ score but found the plaintiff ineligible because of the failure to display deficits in adaptive functioning.

Significant Work Related Limitations: The third analysis under 12.05(c) looks to additional impairments that impose a significant work-related limitation. There are no guidelines regarding what "significant" means in the 12.05(c) determination. The Second Circuit has not confronted the issue either, although other circuits are divided. This District, along with the Eastern, Southern, and Northern Districts of New York, have followed the same understanding of "significant." See Hill v. Astrue, 1:11-CV-0505, 2013 WL 5472036, at *8-9 (W.D.N.Y.

33

Sept. 30, 2013); Marmer v. Colvin, No. 13-CV-2787, 2014 WL 1365471, at *4 (E.D.N.Y. April 7, 2014); Thogode v. Colvin, 3:14-CV-1051, 2015 WL 5158733, at *1 (N.D.N.Y. Sept. 2, 2015); all citing Beneky v. Apfel, 96-CV-7419, 997 F.Supp. 543, 545-48 (S.D.N.Y. March 20, 1998) ("In determining whether an additional impairment imposes a 'significant' work-related limitation, the standard is whether the additional impairment satisfies the severity test."). The definition of "severe" is more than *de minimus* and is the same as the test performed pursuant to the second step evaluation process under 20 C.F.R. 416.920, i.e. whether the impairment significantly limits the applicant's physical or mental ability to do basic work activities. Id.; See also, Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995) (defining the severity test under the second step); Hinkle v. Apfel, 132 F.3d 149 (10th Cir. 1997) (holding that a significant limitation of function for purposes of 12.05C is one that has more than a slight or minimal effect on the claimant's ability to perform basic work); Warren v. Shalala, 29 F.3d 1287, 1291 (8th Cir. 1994); Nieves v. Secretary of Health and Human Services, 775 F.2d 12, 14 (1st Cir. 1985) (finding that severe is more than slight or minimal).

In this case, the ALJ made the severity determination at step two and noted that "the claimant's above impairments are

34

cumulatively severe because in combination they cause more than minimal limitations on his ability to undertake basic work activities." AR. at 53. Accordingly, plaintiff qualifies for Listing 12.05(C) under the third prong as well.

Disposition: Under 42 U.S.C. § 405(g), district courts have the authority to affirm, reverse, or modify a decision of the Commissioner with or without remanding the case for hearing. See, e.g., Butts v. Barnhart, 288 F.3d 377, 385-87 (2d Cir. 2002). Remand for further proceedings is appropriate where there are gaps in the administrative record or the ALJ has applied an improper legal standard and further findings would "so plainly help to assure the proper disposition of [the] claim[s]". Rosa v. Callahan, 168 F.3d 72, 82-83 (2d Cir. 1999); See also, Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996); Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980). By contrast, "where this Court has no apparent basis to conclude that a more complete record might support the Commissioner's decision," it is appropriate to remand for a calculation of benefits. Rosa, 168 F.3d at 83. In other words, a court should order the payment of benefits when a remand for further proceedings is unnecessary because the record contains persuasive proof of disability. Burton v. Colvin, No. 6:12-CV-6347, 2014 WL 2452952, at *13 (W.D.N.Y. June 2, 2014) (citing

Carroll v. Secretary of Health and Human Serv., 705 F.2d 638, 644 (2d Cir. 1981).

Here, there is no indication that a broader record would support the Commissioner's decision. The Commissioner's finding that plaintiff does not qualify as disabled at step three is not supported by substantial evidence. To the contrary, the record is clear that plaintiff qualifies as disabled under Listing 12.05(c). Because there are no outstanding issues needing resolution before a determination of disability can be made, the Court finds that it is appropriate to remand the matter to the Commissioner for a calculation of disability benefits.

## Conclusion

For the reasons discussed above, this Court finds that the ALJ's decision was not supported by substantial evidence in the record. Therefore, Commissioner's motion for judgment on the pleadings (Docket # 10) is **denied**, and plaintiff's motion for judgment on the pleadings (Docket # 9) is **granted.** The Commissioner's decision is reversed, and the matter is remanded for a calculation of disability benefits beginning from December 7, 2010.

JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:      December 16, 2015
            Rochester, New York